DE KAY *vs.* IRVING and DE KAY, executors of Eckford.

A devise to executors to pay the testator's widow as she should request it money *to* maintain his family, consisting of more than two persons, until a certain day when his estate was to be divided, and if she should die before that day that the executors should apply the money for the maintenance of the family, is a valid trust until the appointed day, if the widow lives so long, but upon her death before the day it ceases. The provision over to the executors is void, as it renders the estate inalienable for a term not determinable at the expiration of not more than two lives in being at the testator's death.

Where an estate is devised to trustees upon successive trusts, some of which are lawful and some contrary to law, the lawful trusts will not be defeated by those contrary to law, but will be upheld as far as practicable to effectuate the intent of the testator.

Where technical terms are employed in a will, in such a manner that to give them their strict meaning would defeat the intention of the testator apparent from the will, a liberal or popular interpretation will be given them in order to carry into effect his intention. Thus the term "*inherit*" will be held applicable to lands *devised* or *conveyed* by a parent or ancestor to a child or descendant.

APPEAL from chancery. The report of the case in that court will be found in 9 *Paige*, 521. From the decree made by the chancellor the defendants George De Kay and Janet his wife

appealed.   The leading facts of the case are contained in the opinion of Justice Beardsley.

*N. Dane Ellenwood & Geo. Wood,* for appellants.

*F. B. Cutting & D. Lord,* for respondents.

BEARDSLEY, J.   In June, 1831, Henry Eckford, then of the city of New-York, made and executed his last will and testament, in due form of law, and in November of the succeeding year he died.   Marion Eckford, his wife, was made executrix, and James E. De Kay and others executors.   Shortly after the death of the testator, the will was proved before the surrogate of the city and county of New-York, and letters testamentary were granted to the executrix and executors, who thereupon entered upon the performance of their duty in the execution of the will.

At the time of making his will, the testator had the following children who survived him : Janet the wife of James E. De Kay, one of the executors ; Eliza the wife of Gabriel F. Irving, also an executor ; Joseph Eckford and Henry Eckford, junior. He had also a granddaughter Janet Joseph Halleck Drake, the daughter of his daughter Sarah, and her husband Joseph Rodman Drake, both of whom had died before the making of the will.   Since the death of the testator, this granddaughter Janet Joseph Halleck Drake has intermarried with George C. De Kay, and they are the only appellants in the case.   The sons of the testator, Joseph and Henry, and the granddaughter Janet were infants at his decease.   The testator left an estate of considerable value, but he was at his death somewhat indebted, a part of his debts being charged on his real estate.

As it is urged that certain matters which occurred in the testator's lifetime have an important bearing on the construction which his will should receive, I will state them as they appear to have taken place.   It appears that after the intermarriage of the testator's daughter Sarah with Joseph Rodman Drake, and while both were living, he conveyed to his son-in-law a house

and lot in Grand-street known as No. 385, and the house and lot No. 34 in Park Row, and also a stock of drugs and medicines, with some other property. In 1820, Joseph Rodman Drake died, leaving a will by which, after certain specific bequests, he gave all the residue of his estate, real and personal, to his daughter, the said Janet Joseph Halleck Drake, now the wife of George C. De Kay and one of the appellants, with a devise over upon certain contingencies, which as they have not occurred, and now never can occur, need not be stated. Mrs. Drake and her father were appointed executrix and executor, and guardians of Janet during her minority, and took upon themselves the execution of the will. Under the authority of some proceedings, the validity of which is not here drawn in question, they sold the house and lot in Park Row, and the proceeds were received by the executor Henry Eckford. By the receipt of that money and other funds of Joseph Rodman Drake's estate, Henry Eckford was on the 14th of August, 1826, indebted to it as executor and guardian in the sum of $27,000. He thereupon on that day made an indenture, in which, after referring to the will of Joseph Rodman Drake, it was recited that "said Henry Eckford, in his said capacity as executor and guardian" was so indebted, wherefore, "in consideration of the premises and of the sum of $10," he granted unto his daughter Sarah Drake certain lots of land in the city of New-York, which were particularly described and are known as the Love-lane property, to hold the same to the said Sarah Drake, "her heirs and assigns forever, *in trust* for her daughter the said Janet," her heirs and assigns forever; but if she should die under lawful age without lawful issue, then in trust for the said Sarah Drake, her heirs and assigns forever. Mrs. Drake died before her father made his will, so that at that time Janet owned the Grand-street house and lot which she received by devise from her father, and the Love-lane property which was conveyed to her mother in trust for her. The two sons of Henry Eckford and his granddaughter Janet were unmarried and infants. By his will he expressed a desire that his estate should not be divided until the first day of February, 1840, and that it

should until then be maintained, improved and disencumbered by his executrix and executors, as far as practicable and judicious, and that in the mean time such of his family as might desire to do so, and as far as circumstances would permit, should continue to reside with his wife and be maintained by his estate respectably : "Wherefore," as the will states, "I desire that as often from time to time as she shall desire the same, and until the said division of my estate shall be made, my said wife Marion Eckford shall receive from my estate such sum and sums of money as she shall request, to enable her to maintain my family as aforesaid, for which sum and sums of money she is not to be accountable ; and should she die before the said division shall be made, then I direct my executors to devote so much money and take such measures to maintain and keep my family together as they my said executors, or a majority of them, shall consider best." The will then directs, that until the division shall be made the executors may sell and convey such and so much of the real or personal estate as they may judge necessary or prudent, and gives them authority to borrow money on the credit of the estate, and to give mortgages for the security of the sums to be borrowed. There is also a request that the real estate on the east side of the city of New-York be first disposed of, and that the rest of the real estate in the city be disencumbered and kept unsold until the division should be made between the devisees. On the division, there was an authority to divide in kind, or to sell and divide the proceeds as the executors should deem advisable. There were other specific provisions not material to the questions before the court. The clause of the will directing a division to be made is in these words : "I direct that on the first day of February, in the year of our Lord 1840, my estate shall be divided (all debts and charges against it first being paid, and the moneys hereinafter directed to be set apart first being invested and deducted) among my four children and grandchild hereinafter named in manner following, that is to say : all my estate and all the property which the husband of my daughter Janet, James E. De Kay, has derived from and purchased with funds furnished by me

and which has not been received back by me; and all the real estate which my granddaughter Janet Joseph Halleck Drake has inherited from her parents severally or either of them, and which her said parents severally or jointly originally received or derived from me, shall all be valued in one united valuation, to be made by appraisers to be appointed by my executrix and executors, or a majority of them or of the survivors of them : and the aggregate amount of the said united valuation shall be divided into five equal parts, and so much of the said aggregate estate as shall be equal in value to one of said five parts shall go to each of said children and said grandchild in fee ; including however in the portion of my said daughter Janet the property which her husband James E. De Kay has derived from and purchased with funds furnished by me and which has not been received back by me ; and including in the portion of my said granddaughter Janet Joseph Halleck Drake all the real estate which she has inherited from her parents severally or either of them, and which her said parents severally or jointly originally received or derived from me ; so that finally, including what some of the said five shares shall already have derived from me and what remains to be distributed, my said four children and grandchild and their respective heirs shall have received from me an equal share of property—one not more than another." Having made the various provisions to which I have already adverted, the testator further declared, " I devise and bequeath all my estate, real, personal and mixed, whatsoever and wheresoever, unto my executrix and executors," and " to the survivors and survivor of them, and the heirs, executors, administrators and assigns of the survivor. To have and to hold the same to, for and upon the special trusts and confidence that they may carry into effect, perform and accomplish the provisions, intentions, directions, purposes and uses hereof and herein contained, and with full power to seal, sign, execute, acknowledge and deliver all and any conveyance and conveyances, deed and deeds, and instruments of every description, proper, necessary or lawful to pass and convey real as well as personal estate, and to do every thing necessary to effectuate the intention hereof."

De Kay *v.* Irving.

The bill of complaint in this case was filed by the executors to obtain a judicial interpretation of the will, and to have the estate divided under the authority and direction of the court of chancery. On the argument two objections were made by the counsel for the appellants to the decree of the chancellor: 1. That the will was void, as rendering the estate inalienable for a longer time than the law allows ; and 2. That the real estate contained in the deed of the 14th of August, 1826, called the Love-lane property, ought not to be valued and brought into hotchpot in making a division of the testator's estate.

As to the first of these objections. By his will the testator conferred various powers on his executrix and executors, as to sell and convey his estate—borrow money on mortgage—set apart and invest money to pay annuities to his mother, and the like. None of these powers required that the executrix and executors should have any estate in the land devised, for every thing they were in these respects required to do might be done in the mere execution of the powers conferred by the will. But the testator certainly intended that his executrix and executors should for some purposes take his estate as trustees. They were to manage and improve it until a division should be made between the five devisees, and during the lifetime of Mrs. Eckford, if she died before the first of February, 1840, and if she did not, then until that time they were to pay over to her for the support of herself and the family of the testator so much money as she might desire for that purpose. This was to be paid from the *estate*, and not merely from the *rents and profits*. But the latter as received would constitute a part of the estate. Mrs. Eckford and the family of the testator had therefore an interest in these rents and profits, and a trust was thus created to receive and apply them to the use of the family for the time specified. I regard this as a trust to receive and apply these rents and profits ; for paying them over to Mrs. Eckford, to be by her expended in the support of the family as directed by the will, would, in my judgment, be applying them within the true intent and meaning of the statute on that subject. A trust for this purpose is within certain limits authorized by law, and

when duly created it vests the estate in the trustees. But they have no power to dispose of it : the estate is absolutely inalien able during the continuance of the trust. Consequently such a trust cannot endure beyond the limit of two lives in being, and its duration must be measured by life. This is well settled. If the will had transferred the estate to the trustees to receive and apply the rents and profits during the life of Mrs. Eckford, but in no event beyond the first of February, 1840, there could be no doubt that the provision would have been valid, for it would have been entirely unobjectionable as to transcending the line of perpetuity. But there is a further direction in the will that in the event of Mrs. Eckford's death before Feb. 1840, the surviving trustees should devote enough money of the estate to support the family of the testator until that time. This must be understood as a direction to apply the rents and profits, during that period, to the use of those who should then constitute the family of the testator. But this direction was wholly invalid as creating a trust, whatever may have been its effect as a power : the trust term was illegal, being limited by a fixed day, that is, the first of February, 1840, and in no sense by lives or a life. Of this opinion was the chancellor, and I concur with him in his view of this part of the will.

If the testator had in terms assumed to transfer the estate to the executrix and executors, as trustees, to receive and apply the rents and profits until the 1st of February, 1840, the case would have been, in principle, like those which arose on the Lorillard and James wills. In *Lorillard's* case, the estate was devised to thirteen trustees as joint tenants, during the lives of all, and until the death of the longest liver of them. There, the trust term was held to be void, the limitation being illegal. The term was to endure for the lives of thirteen persons, when, at the utmost, it could only be for the lives of two. In *James'* case, the trust term was to continue until the youngest of the grandchildren of the testator, living at his death and attaining the age of twenty-one years, should attain that age. As there were more than two grandchildren the trust term was held void, its duration being measured by more than two lives.

De Kay *v.* Irving.

If this estate had been devised to the trustees, in express terms, until the first of Feb. 1840, it would, upon the authority of these cases, have been illegal. But such was not the fact. The devise to the trustees was not for any limited or specified period, or until any particular event should occur; but it was " to, for and upon the special trusts and confidence, that they may carry into effect, perform · and accomplish the provisions, intentions, directions, purposes and uses," specified in the will. This ought not to be construed as creating a trust estate for an illegal period of time, whatever the devisor may have intended to do. He may have designed to vest the estate in the trustees until Feb. 1840, and still, as the nature of the trust was such that it could not be limited to any certain period of time, the words used should receive such a construction as will give effect to the lawful intent of the testator, as far as that may be practicable. The devise to the trustees should therefore, as I think, be understood to convey the estate to the trustees, for such legal purposes as required it thus to be vested in them; and in other respects to be inoperative. It was lawful to transfer the estate to the trustees to receive the rents and profits, and apply them as directed, during the life of Mrs. Eckford, but to terminate on the first of Feb. 1840, if she should survive that time. This trust was legal in its object, that is, to receive and apply the rents and profits to the benefit of the testator's family. It was also legal in point of duration, for it was necessarily limited to the life of Mrs. Eckford, and it would not continue for the whole of that time, if she survived the first of February, 1840.

The testator, no doubt, intended the trust should continue, until the first of February, 1840. But so far as it was his intention to vest the estate in the trustees, that they might receive and apply the rents and profits after the decease of Mrs. Eckford, the devise was void. This, however, ought not to destroy or affect the trust for her life, which was legal. The trust to receive and apply the rents and profits after her decease, was not, in any respect, necessarily connected with a similar trust during her life. After her decease, the trustees would not be the same as while she lived; nor would the persons to whose

use the rents and profits were to be applied, be the same. Upon the terms of this will, then, I think the trust term, as limited by the life of Mrs. Eckford, but not to extend beyond the first of February, 1840, was legal : that the estate was accordingly vested in the trustees; although the provision for a trust term to commence from the time of her decease, if she should die before February, 1840, and endure until that time, was illegal. It is now of no consequence in this case, whether this second trust term, as provided for, was or was not illegal, for Mrs. Eckford survived the first of February, 1840, when the trust was necessarily brought to a close, as the estate was then to be divided. The direction in the will to make partition of the estate did not require the title to be vested in the executrix and executors, as it might be done by the exercise of a naked power, and created no suspense of the power of alienation. There was then, in my opinion, nothing in this will, except the fragments already referred to, which transcended the line of perpetuity, or which can, on that or any other ground, be held to invalidate any other of its provisions.

The second objection made to the decree, is next to be considered.

The will was not drawn with much attention to accuracy in the selection of words to express the object which the testator had in view. If the words used are to be taken in their strict sense and significance, the clause directing a valuation of the real estate of the granddaughter, Mrs. George C. De Kay, must be wholly inoperative. By the terms of the will the real estate of the granddaughter, to be valued, was such as she had *inherited*. But this was not all: it was to be such as she had "inherited *from her parents severally or either of them*, and which her parents, severally or jointly, originally received or derived from" the testator.

Now, in strictness, the granddaughter had no real estate which would answer this description. She had *inherited* none whatever, from either of her parents, although the two city lots, as has already been stated, were *devised* to her by her father ; she had also received through the trust deed, which was given

to her mother as grantee, the Love-lane property. Neither of these parcels of real estate, however, came to her by *inheritance :* strictly speaking, therefore, she had none which would answer the description contained in the will.

But this part of the will should not be overthrown, and the intention of the testator frustrated, on ground so technical and narrow. Although words have been used inaccurately, we may, perhaps, gather from the state of the property of the granddaughter at the time the will was made, the condition of the family of the testator, and from other parts of the will, what was really intended by the particular clause under consideration. If that intention can thus be discovered, it will be the duty of the court to carry it into effect, without regard to the inaccuracy of the language made use of by the testator.

It will be recollected that the testator had given to his son-in-law, Joseph Rodman Drake, the father of Mrs. George C. De Kay, two city lots, which had passed to her, by devise, on the decease of her father. She was then an infant, and her grandfather, the testator, was one of the executors of her father's will, and one of her guardians. As such guardian he sold one of the city lots, and received the money therefor. For this money and otherwise, he became indebted to the estate of his deceased son-in-law—or in other words, to his granddaughter, to whom that estate belonged—and in order to pay or secure payment of the amount of his indebtedness, the Love-lane property was conveyed to the mother of the granddaughter, but in trust for her. Before this will was made the mother had died, and the granddaughter had become absolute owner of the Love-lane property. In addition to this, she also then owned the Grand-street lot which had been *devised* to her by her father. Both of these parcels of real estate, it will be observed, came originally from the grandfather ; one had been conveyed to his son-in-law, the father of the granddaughter, and the other to her mother, as grantee in the trust deed. In this condition of the real estate of the granddaughter, the devisor made his will. His general object, as the will states, was to equalize in value the property which his four children and this grandchild, who

represented a deceased child, had received, and were to receive from him. For this purpose his estate was to be divided into five equal parts ; but the property which his son-in-law, James E. De Kay, had received from, and not repaid to him, was to be valued and taken as part of the share of his wife, who was one of the daughters of the testator. Then comes the clause directing the valuation, for a like purpose, of some real estate which was owned by the granddaughter, and which is described as real estate which she " inherited from her parents, severally or either of them, and which her said parents severally or jointly, originally received or derived from " the devisor. The description, at best, is vague and almost unintelligible, and, in strictness, cannot be applied to any real estate owned by the granddaughter. Still, the testator intended to refer to some real estate, of which the granddaughter was then owner, and which he described as having been inherited by her. This was one circumstance to indicate the particular property referred to by him, and another was that it came originally from the testator himself, to the father or mother of the granddaughter. It does not appear that the granddaughter then owned any real estate, except the Grand-street lot and the Love-lane property, both of which were originally derived from the testator, one by his deed to the father of the granddaughter, and the other by the trust deed to the mother. So far, both these parcels of real estate answer one part of the description given in the will—they were derived from the testator. They, however, were not *inherited* by the granddaughter. She had no real estate which came to her in that manner, and this word cannot be understood in its strict legal sense. In ordinary parlance property received by devise, or in any other form from a parent, is said to come by inheritance, and in this sense the word was used by the testator. I therefore think we must understand this part of the will as requiring the Love-lane property to be valued, and that it should be carried into effect in that way.

The testator's object was to equalize his gifts to his four children and this grandchild, and this could only be done by valuing what each had before received in that form. It is true.

this Love-lane property had not been conveyed to the grand daughter as a gift to her, although the testator, undoubtedly, regarded it in that light. In his mind this property took the place of the Park Row lot, which he had before given to the father of the granddaughter, but which had been sold, and the proceeds used by the testator. He then might very well regard the Love-lane property as strictly a gift as the Park Row lot had been, and so regarding it, it was entirely proper to direct that it should be valued in ascertaining the share of the granddaughter. But whether it was just and proper to require this real estate to be valued was for the testator alone to consider and determine. He was about to dispose of the residue of his property, and he might impose such restraints and conditions, unless they were illegal, as seemed to him proper. I see nothing unjust in requiring this piece of real estate to be valued ; and there was certainly nothing illegal in it.

There is one further circumstance to be adverted to, going to show that the testator had reference to the Love-lane property, in directing what real estate of the granddaughter should be valued. He had given some property to his son-in-law, James E. De Kay, which was required by the will to be valued. In referring to this property the will indicates it as that which his said *son-in-law* had derived from and purchased by funds furnished by the testator, and which had not been received back by him. But in describing the real estate of the granddaughter, which was to be valued, it was not such as the testator had conveyed to her father, but such as her *parents had severally or jointly* derived from the testator. He plainly had in his mind, and intended to indicate, real estate which the *mother*, as well as the father of the granddaughter, might have derived from him. Hence he could not have intended to refer to the two lots conveyed to the father of the granddaughter, for these the mother had, in no sense, derived from the testator. But in some sense, the Love-lane property was derived by the mother from the testator, for it was conveyed to her in trust. I am, therefore, well satisfied he intended the Love-lane property, as well as the Grand-street lot, should be valued as part

of the portion of Mrs. George C. De Kay. In this way, unless she has already received more than one-fifth of the estate, the great object of the testator—an equality in his gifts—will be attained. If the granddaughter has already more than that share, it cannot be recalled; but if she has less, the amount to be apportioned to her should only be brought up to one-fifth, including the Love-lane property, and the Grand-street lot.

I think the decree of the chancellor should be affirmed.

LOTT, Senator. I have arrived at the conclusion after a careful examination of this cause that the decree of the chancellor is correct, except so far as it declares "that the property embraced in the deed from Henry Eckford and Marion his wife, to Sarah Drake, the widow of Joseph R. Drake, dated 14th August, 1826, (generally called the Love-lane property) was and is to be deemed real estate inherited from the parents of the defendant Janet H. the wife of George C. De Kay, or one of them, and which was originally received or derived from Henry Eckford within the intent and meaning of his will," and was to be appraised in the valuation directed to be made on the division of his estate.

That property was conveyed to Mrs. Drake by Mr. Eckford, not as a bounty or an advancement, but in satisfaction of a debt of $27,000 due from him as executor of the will of Joseph R. Drake and as guardian of his infant daughter Janet H. Drake, for moneys received on account of the estate. That and the nominal sum of ten dollars are stated in the deed itself to be the consideration for the grant.

This conveyance (which by a previous decision of the chancellor confirmed by this court was intended to be absolute and not as a mortgage only) was not made to Mrs. Drake in her own right, but (as declared in the instrument itself) "in trust for her daughter the said Janet H. Drake, her heirs and assigns forever, provided said Janet shall not die under lawful age and shall not have lawful issue, but should the said Janet H. Drake die under lawful age, and without issue, then in trust for the sole and only use, benefit and behoof of her the said party of the sec-

ond part, and of her heirs and assigns forever," being the disposition made by the will of Joseph R. Drake of the bulk of his property except on the contingency, both of the death of Mrs. Drake before her daughter and of the death of her daughter before she arrived at lawful age and without leaving any child or children, in which event it was devised over to Henry Eckford, and in case of his death to his children in fee.

It does not appear what the value of these premises was at the time of this conveyance. It is not however unreasonable to assume from the fact of its having been declared not to have been intended as a mortgage, that it was not more than a fair equivalent for the estate given by the will of Dr. Drake to his daughter and wife irrespective of Mr. Eckford's contingent interest.

But be that as it may, there is not the least evidence that this property was conveyed for any other object or with any other intent than to pay and satisfy a debt. It appears from the bill itself that Mr. Eckford had in his lifetime conveyed to Joseph Rodman Drake, his son-in-law, a house and lot in Park Row, in the city of New-York, which after the death of Dr. Drake was sold by his executors (under what authority is not shown) and that Mr. "Eckford received the proceeds thereof, and thereby and *otherwise* became and was on or about the 14th day of August in the year 1826, (the day of the date of the deed) indebted in his capacity as executor and guardian to the estate of Joseph Rodman Drake, in the sum of twenty seven thousand dollars or thereabouts," and that he thereupon executed the deed in question.

What the amount of those proceeds was or what other indebtedness existed is not shown. We therefore do not know what proportion of the Love-lane property represents the house and lot in Park Row. It would seem from the will of Dr. Drake that he had personal estate. Whether the debt *"otherwise"* than that arising from the proceeds of the sale of the Park Row house arose from a misapplication of that or of the rents, &c. of the real estate does not appear, nor is it material. It is sufficient to know that there was a debt and that growing

out of a fiduciary relation which Mr. Eckford in conveying the Love-lane property intended to discharge, merely as an act of justice, and his heirs are not now at liberty to treat it as a mere bounty.   I concede that Mr. Eckford, in making a disposition of his own property by will, had the right in any devise or bequest to Janet H. Drake, to make it a condition *that she, to entitle herself to it,* should consent to have the property so conveyed to her estimated as a part of his estate, and charged as payment on account of her share.   But I cannot *believe* when he expressed his intention to be, that his five children and grandchild should receive from him an equal share of property, that he meant to consider that which had been paid in satisfaction of a debt due and that of the highest character, as a part of that property.   On the contrary, I have no doubt that in declaring " all the real estate which his granddaughter had inherited from her parents severally or either of them, and which her said parents severally or jointly originally received or derived from him should all be valued in one united valuation, he meant to include only such as had been granted by way of advancement or gift.   Such a construction is natural and consistent with the principles of equity.   If he had died intestate and all his children had survived him, it is certain the value of such estate only as had been advanced by way of settlement or portion could have been estimated under the statute regulating descent and distribution as a part of his estate descendible to his heirs and to be distributed according to law.   This general rule he undoubtedly wished to be observed in the division of his own estate except as to the time of the valuation—which was fixed when the division was to be made, instead of the time of advancement.   As however one of his daughters had died leaving a child, Janet H. De Kay, one of the defendants, and as his son-in-law James E. De Kay appears to have held property in his own name which was derived not directly from Mr. Eckford, but purchased with funds furnished by him, he directs that all the property which the parents of his granddaughter or either of them had derived or received from him, as well as that so received by James E. De Kay, should with his own estate

be valued in one united valuation, and then divided into five equal shares, giving each child and his granddaughter one share, including however as part of the share of his grand-daughter and of his daughter Janet, the wife of James E. De Kay, the value of the property which was directed to be appraised in the valuation. By this arrangement the property received by Dr. Drake and James E. De Kay is treated as a part of the testator's estate at the time of the division, and an equal distribution is made among his heirs. This construction too, fully satisfies the terms of the will. It did not require that all the real estate of his granddaughter should be valued, but only such as had been inherited from her parents severally, or either of them, and which her said parents severally or jointly originally received or derived from him.

Two requisites are necessary to bring the property within the requirements of the will : one that the property should have been received or derived from him by Mr. and Mrs. Drake, or one of them, and the other that it should have been inherited by his granddaughter from her parents or one of them. Neither of those qualifications attach to the Love-lane property. It was conveyed after the death of the father. The conveyance was, it is true, to Mrs. Drake, but only in trust primarily for her daughter, and in a certain event as her own property—and that as I have before shown in payment of a debt. It did not descend therefore from her, but passed by the deed from Mr. Eckford himself. It has been said, and so it appears to have been assumed by the chancellor, that the house and lot the proceeds of which formed a part of the consideration money for the Love-lane property, had been sold under the statute of 1815 providing for the sale of infants' estates, and which "in terms declared that the proceeds of such a sale should be considered not only in relation to the statute of descents and distributions, *but for every other purpose*, as if the real estate had not been sold." (*Laws of* 1815, *p*. 104, § 5.) And the chancellor thereupon concludes that the property embraced in that deed was therefore in law real estate inherited from her parents or one of them, and which was originally received or derived from the

testator within the intent and meaning of his will." Two diffi-
culties encounter this view of the case; one, and an insupera-
ble one, is that there is no allegation in the bill, or any of the
pleadings, and there is no proof that the property was sold un
der that law. The bill only alleges that Mrs. Drake and Mr.
Eckford duly qualified as executors and assumed the burden
of the execution of the last will and testament of Dr. Drake,
and that " they sold the said house and lot in Park Row," &c.
but under what authority is not stated. If it be conceded, how-
ever, to have been made under the act referred to, the other
difficulty attaches. It was the principal object of that statute,
and of the act of April 9, 1814, to which it was an addition, to
convert the real estate of infants into money for their better ed-
ucation and maintenance, and not for investment in other real
estate, which could he done only under the directions of the
chancellor; " and from such time the infant, as far forth as
relates to said property, its proceeds and income, was consid-
ered a ward of the court of chancery; and it was a power
exercised with great caution." (*See Matter of Whitaker,*
4 *John. Ch. Rep.* 378; *Matter of Mason,* 1 *Hopk.* 122.) I,
was contemplated that the proceeds should be held subject to
the control of the court, who were to make order for the invest
ment and disposition thereof so as to secure the same to the infant,
in such way and manner as might seem most for his or her
benefit or advantage, (§ 4, *p.* 104,) and that they should retain
the quality and character of the estate from which it was de
rived, it being expressly declared not only as stated by the
chancellor, that " they should be considered in relation to the
statute of descent and distribution, and for every other purpose,
as if the said real estate had not been sold;" but also " that no
sale of the real estate of any infant, in pursuance of the pro-
visions of this act, shall give any person any other or
greater estate in the proceeds of such real estate than he would
have had provided the same had not been sold." (§ 5.) If
they had been appropriated by Mr. Eckford under the direc-
tions of the court of chancery, in the purchase of this property,
then there would be some reason and propriety in considering

Irving *v.* De Kay.

it as real estate derived from Mr. Eckford; but it was never in fact so conveyed, and there is no pretence that Mr. Eckford intended it as an investment of those proceeds. He had become a debtor by the appropriation of those funds *or otherwise,* and cannot now be considered as having granted the premises except as a payment of his debt. But if there were any ground for treating the substituted property as a representative of those proceeds, yet there is no equity in charging Mrs. De Kay with the whole value. There was other indebtedness represented, and that, certainly, cannot by any pretext be treated as a portion of the estate of the debtor. But I cannot yield my assent to the proposition that Mr. Eckford, or his heirs or representatives, can now convert the payment of a debt contracted under the circumstances alleged in the bill, into a bona fide investment of trust funds. Independent of other considerations, it would in effect and in its consequences, reverse the decision of the chancellor and of this court, declaring the deed of the premises conveyed as absolute, and not as a mortgage; and indeed it would be much more disadvantageous to her than to have considered it as a mortgage. Then the Love-lane property would have been the real estate of Mr. Eckford himself, and its value would have formed a part of the aggregate valuation, but Mrs. De Kay could only have been charged with the value of the Park Row house and lot, and she would then have been entitled to a proportional part of the excess of the value of the Love-lane property. But if the chancellor's decision is permitted to stand, she will be charged with the entire valuation placed on the latter, and of course receive no benefit of such excess; a consequence which it is evident, from the whole frame and scope of the bill, that even the executors themselves never believed to have been in the contemplation of their testator.

Having then, I think, shown that the construction given by the chancellor to the clause on which the question is raised, is unjust and inequitable, and not required by the terms of it, I will merely add in conclusion that the testator's language is fully satisfied by including the Park Row house and lot in the valuation. This was in fact received from him by Dr. Drake,

and it passed to his daughter Janet, either under the will or as heir at law. In either case it may be considered as inherited from one of her parents.

I am therefore of opinion that the decree appealed from should be modified accordingly.

TALCOTT and WILLIAMS, Senators, delivered written opinions in favor of affirming the decree of the chancellor.

HAND, Senator, delivered a written opinion in favor of reversal.

Upon the question being put, " *Shall the decree of the court of chancery be reversed?*" the members of the court voted as follows :

*For affirmance :* The PRESIDENT, Mr. Justice BEARDSLEY, and Senators BARLOW, DENNISTON, DEYO, EMMONS, JOHNSON, PORTER, SCOVIL, J. B. SMITH, TALCOTT, WHEELER, WILLIAMS—13.

*For reversal :* Senators HAND, LOTT, SANFORD, WRIGHT, —4.

Decree affirmed.